GIBBONS, J., delivered the opinion of the court in which MERRITT, J., joined, McKEAGUE, J. (pp. 556-65), delivered a separate dissenting opinion.
OPINION
JULIA SMITH GIBBONS, Circuit Judge.
In this case, we are called on to decide whether the National Labor Relations Board may apply the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151-169, to the operation of a casino resort of the Little River Band of Ottawa Indians. The Band’s tribal council enacted an ordinance to regulate employment and labor-organizing activities of its employees, including casino employees, most of whom are not members of the Band. The Board issued an order to the Band to cease and desist from enforcing the provisions that conflict with the NLRA. We hold that because the NLRA applies to the Band’s operation of the casino, the Board had jurisdiction to *540 issue the cease and desist order. Accordingly, we grant the Board’s application for enforcement of the order.
I.
The Band is a federally recognized Indian tribe with more than 4,000 enrolled members, most of whom live within or near the Band’s aboriginal lands in the State of Michigan. See Little Traverse Bay Bands of Odawa Indians and the Little River Band of Ottawa Indians Act (the Little Bands Act), 25 U.S.C. § 1300k-2(a). Pursuant to the Little Bands Act and the Indian Reorganization Act, 25 U.S.C. § 476, the Band enacted a constitution and amendments thereto, which have been approved by the Secretary of the Interior. The Band’s constitution vests the Band’s legislative powers in the Tribal Council and grants power to the Tribal Council to operate gaming pursuant to the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701-2721.
Pursuant to the IGRA, the Band entered into a compact with the State of Michigan to conduct class III gaming activities, as defined by 25 U.S.C. § 2703(8), on the Band’s trust lands in Manistee, Michigan. The gross revenues from the Little River Casino Resort, a tribally-chartered, subordinate organization of the Band, exceed $20 million annually. According to the IGRA, the net revenues from the casino may be used only to fund the Band’s tribal governmental operations or programs, to provide for the general welfare of the Band and its members, to promote tribal economic development, to donate to charitable organizations, or to help support the operations of local government. See 25 U.S.C. § 2710(b)(2)(B). The revenues from the casino provide over fifty percent of the Band’s total budget.
The record in this case shows that the casino has 905 employees—107 of whom are enrolled members of the Band, 27 of whom are members of other Indian tribes, and 771 of whom are neither members of the Band nor of any other Indian tribe. The majority of casino employees live outside the Band’s trust lands, and the majority of the casino’s customers are not members of Indian tribes. Apart from the casino, 245 employees currently work for the Band’s other governmental departments and subordinate organizations. Of this number, 108 are members of the Band and 137 are not members of the Band. In sum, of the Band’s 1,150 total employees, 908 are not members of the Band.
In 2005, the Tribal Council enacted the Band’s Fair Employment Practices Code (FEPC), which it amended most recently on July 28, 2010. In pertinent part, the FEPC contains Article XVI, “Labor Organizations and Collective Bargaining,” and Article XVII, “Integrity of Fair Employment Practices Code,” which regulate labor-organizing activities and collective bargaining. These articles apply to casino employees and labor organizations representing or seeking to represent casino employees. As amended, Article XVI, inter alia, grants to the Band the authority to determine the terms and conditions under which collective bargaining may or may not occur; prohibits strikes, work stoppage, or slowdown by the Band’s employees and, specifically, by casino employees; prohibits the encouragement and support by labor organizations of employee strikes; prohibits any strike, picketing, boycott, or any other action by a labor organization to induce the Band to enter into an agreement; subjects labor organizations and employees to civil penalties for strike activity; subjects employees to suspension or termination for strike activity; subjects labor organizations to decertification for strike activity; subjects labor organizations to a ban on entry to tribal lands for *541 strike activity; and requires labor organizations doing business within the jurisdiction of the Band to apply for and obtain a license. Article XVI also precludes collective bargaining over the Band’s decisions to hire, lay off, recall, or reorganize the duties of its employees; precludes collective bargaining over any subjects that conflict with the Band’s tribal laws; exempts the Band from the duty to bargain in good faith over the terms and conditions under which the Band’s employees may be tested for alcohol and drug use; limits the duration of collective bargaining agreements to three years or less; provides that decisions by the Band, through its Tribal Court, over disputes involving the duty to bargain in good faith or alleged conflicts between a collective-bargaining agreement and tribal laws shall be final and not subject to appeal; and limits the period of time during which employees may file a deauthorization petition. Further, Article XVI prohibits the requirement of membership in a labor organization as a condition of employment. It also prohibits the deduction of union dues, fees, or assessments from the wages of employees unless the employee has presented, and the Band has received, a signed authorization of such deduction. As amended, Article XVII prohibits Band employers, such as the casino, from giving testimony or producing documents in response to requests or subpoenas issued by non-tribal authorities engaged in investigations or proceedings on behalf of current or former employees, when such employees have failed to exhaust their remedies under the FEPC.
On March 28, 2008, the Teamsters, Local No. 406, filed a Charge Against Employer, asserting that the Band committed an unfair labor practice in violation of the NLRA. On December 10, 2010, the Acting General Counsel of the Board filed an unfair labor practice complaint, alleging that the above provisions of Articles XVI and XVII of the FEPC interfere with, restrain, and coerce employees in the exercise of their rights guaranteed by Section 7 of the NLRA, 29 U.S.C. § 157, and therefore violate Section 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1). In a proceeding before the Board, the parties stipulated that the only issues for decision were whether the Board has jurisdiction over the Band and, if so, whether the Band violated Section 8(a)(1) of the NLRA, by applying the above provisions of the FEPC. Little River Band of Ottawa Indians Tribal Gov’t, 359 N.L.R.B. No. 84, slip op. at 2 (2013). The only argument the Band presented in its defense was that the Board lacked jurisdiction because the application of the NLRA would impermissi-bly interfere with the Band’s inherent tribal sovereignty to regulate labor relations on its tribal lands.
The Board concluded it had jurisdiction, held that the Band violated the NLRA as alleged, and issued a cease and desist order. Little River, 359 N.L.R.B. No. 84, slip op. at 3-6. In reaching this decision, the Board applied its holding in San Manuel Indian Bingo & Casino, 341 N.L.R.B. 1055 (2004), aff'd, 475 F.3d 1306 (D.C.Cir.2007), in which it decided the merits of a similar jurisdictional challenge. Little River, 359 N.L.R.B. No. 84, slip op. at 2-3. In San Manuel, the Board adopted a framework to determine whether federal Indian law or policy constrains its jurisdiction. 341 N.L.R.B. at 1059-62. That framework begins with the statement from Federal Power Commission v. Tuscarora Indian Nation, 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960), that “a general statute in terms applying to all persons includes Indians and their property interests.” 341 N.L.R.B. at 1059 (quoting Tuscarora, 362 U.S. at 116, 80 S.Ct. 543). In San Manuel, the Board noted three exceptions to the Tuscarora princi- *542 pie, which were first enumerated by the Ninth Circuit in Donovan v. Coeur d’Alene Tribal Farm, 751 F.2d 1113, 1116 (9th Cir.1985). 341 N.L.R.B. at 1059 (citing Coeur d’Alene, 751 F.2d at 1116). The Board followed this approach, holding that general statutes do not apply to Indian tribes if: “(1) the law ‘touches exclusive rights of self-government in purely intramural matters’; (2) application of the law would abrogate treaty rights; or (3) there is ‘proof in the statutory language or legislative history that Congress did not intend the law to apply to Indian tribes.” 359 N.L.R.B. No. 84, slip op. at 3 (quoting Coeur d’Alene, 751 F.2d at 1116). “In any of these situations, Congress must expressly apply a statute to Indians before ... it reaches them.” Id. (alteration in original) (citing Coeur d’Alene, 751 F.2d at 1116). Applying this framework, the Board determined that application of the NLRA to the casino would not interfere with the Band’s “exclusive rights of self-government in purely intramural matters.” Id. The Board also found the second and third Coeur d’Alene exceptions inapplicable. Id. The Board saw “no merit in [the Band’s] central contention—that Federal scrutiny of its FEP Code improperly impairs the exercise of the Tribe’s sovereign right of self-government.” Id. at 4. The Board also applied a discretionary jurisdictional standard intended “to balance the Board’s interest in effectuating the policies of the [NLRA] with the need to accommodate the unique status of Indians in our society and legal culture.” Id. at 4 (citing San Manuel, 341 N.L.R.B. at 1063). The Board found “that policy considerations weigh in favor of the Board asserting its discretionary jurisdiction.” Id. The Board accordingly ordered the Band to cease and desist from applying specific provisions of Articles XV.1 and XVII of the FEPC to employees of the casino, or any labor organization that may represent those employees, and from interfering with employees in the exercise of their rights guaranteed by Section 7 of the NLRA, 29 U.S.C. § 157. Id. at 6. The Band petitioned for review, and the Board cross-appealed for enforcement of its order.
We heard oral argument in this case on October 8, 2013. The Board subsequently moved to vacate its order, to remand for further consideration in light of the Supreme Court’s decision in NLRB v. Noel Canning, — U.S. —, 134 S.Ct. 2550, 189 L.Ed.2d 538 (2014). We granted the Board’s motion. A properly constituted panel of the Board considered the case and issued a decision and order against the Band on September 15, 2014, stating that “we have ... considered de novo the stipulated record and the parties’ briefs. We have also considered the now-vacated Decision and Order, and we agree with the rationale set forth therein.” 361 N.L.R.B. No. 45, slip op. at 1 (2014).
The Board then reinitiated this appeal with an application for enforcement of its order. The application focuses our inquiry on the single issue of whether the Board may assert jurisdiction over the Band to enforce the cease and desist order. In deciding this case, we have considered the briefs and arguments from the prior appeal (Nos. 13-1464 and 13-1583).
II.
The NLRA is a statute of general applicability and is silent as to Indian tribes. See 29 U.S.C. §§ 152(l)-(2), 158(a), 160(a). The NLRA prohibits “employers” from engaging in unfair labor practices. 29 U.S.C. § 158(a). The NLRA creates the Board’s jurisdiction, empowering it “to prevent any person from engaging in any unfair labor practice affecting commerce.” 29 U.S.C. § 160(a). The NLRA defines *543 both “person” and “employer” in general and expansive terms. The definitions of both “person” and “employer” provide a list of entities which those terms cover and, in the case of “employer,” do not cover. See 29 U.S.C. § 152(1); § 152(2). In both cases, the lists are illustrative, not exhaustive, and neither definition mentions Indian tribes.
From one vantage, then, this case is about whether the pertinent statutory terms “employer” and “person,” which trigger the Board’s jurisdiction, encompass Indian tribes. Since Congress has not “directly spoken to the precise issue,” Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), it would seem that Congress has implicitly delegated to the Board the authority to determine the circumstances under which the statutory term “employer” extends to Indian tribes. Under Chevron, if the Board’s interpretation is “a permissible construction of the statute,” 467 U.S. at 843, 104 S.Ct. 2778, we give it “controlling weight,” id. at 844, 104 S.Ct. 2778. The Board sees the case in this light: it interprets the NLRA’s definition of “employer” to cover Indian tribes and argues that its construction is reasonable.
From another angle, however, this case concerns the limits and contours of inherent tribal sovereignty and the proper interpretation of the silence of a generally applicable congressional statute against the background of federal Indian law. The Band submits that under principles of federal Indian law the NLRA, like any other congressional enactment, cannot preempt a tribal government’s exercise of its inherent sovereign authority without a clear expression from Congress. The Board responds that congressional statutes of general applicability that are silent as to Indian tribes, like the NLRA, apply to Indian tribes, unless such application abrogates rights guaranteed by Indian treaties or interferes with exclusive rights of self-governance in purely intramural matters. Central to the argument for its construction, the Board claims that the San Manuel standard follows from judicial opinions expounding federal Indian law and accommodates federal Indian policies. See Little River, 359 N.L.R.B. No. 84, slip op. at 3—4; San Manuel, 341 N.L.R.B. at 1063. Thus, the Board’s arguments for the reasonableness of its construction of its jurisdictional terms are predicated on its analysis of federal Indian law and policy.
From this viewpoint, we find that Chevron does not apply. A reviewing court does not owe Chevron deference to an agency construction if the agency adopts the construction on the basis of a judicial opinion and not on the basis of policy considerations regarding the statute it administers. See, e.g., Akins v. F.E.C., 101 F.3d 731, 740 (D.C.Cir.1996) (en banc), vacated on other grounds, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998); see also Richard J. Pierce Jr., Administrative Law Treatise, § 3.5, at 200 (5th ed.2010). Moreover, federal Indian law and policy are areas over which the Board has no particular expertise, and so we need not defer to the Board’s conclusions with respect to them. Cf. Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 143-44, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002); see also San Manuel, 475 F.3d at 1312. In San Manuel, the D.C. Circuit attempted to separate questions of tribal sovereignty, which it reviewed de novo, from questions about the Board’s construction of the term “employer,” which it reviewed under Chevron. See 475 F.3d at 1311-12, 1315-16. In this case, however, considerations of federal Indian law suffuse every branch of the analysis concerning the application of the NLRA to the *544 casino. At its heart, the question before us is not one of policy, but one of law. We are asked to decide whether federal Indian law forecloses the application of the NLRA to the Band’s operation of its casino and regulation of its employees, and we do so de novo.
III.
A.
We begin by reviewing the law governing the implicit divestiture of tribal sovereignty, which provides an important background when determining whether federal laws of general applicability also apply to Indian tribes absent an express congressional statement. Indian tribes are “distinct, independent political communities.” Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316, 327, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008) (quoting Worcester v. Georgia, 31 U.S. 515, 559, 6 Pet. 515, 8 L.Ed. 483 (1832)). The powers they possess “stem from three sources: federal statutes, treaties, and the tribe’s inherent sovereignty.” Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 168, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (Stevens, J., dissenting). Inherent tribal sovereignty preexisted the founding; it “is neither derived from nor protected by the Constitution.” Id. Indian tribes’ “incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised.” United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (quoting United States v. Kagama, 118 U.S. 375, 381, 6 S.Ct. 1109, 30 L.Ed. 228 (1886)). The Tenth Amendment does not refer to Indian tribes in its reservations of power not delegated to the United States. See U.S. Const. amend. X; see also Merrion, 455 U.S. at 168 n. 17, 102 S.Ct. 894 (Stevens, J., dissenting). As such, the sovereignty of Indian tribes “exists only at the sufferance of Congress and is subject to complete defeasance.” Wheeler, 435 U.S. at 323, 98 S.Ct. 1079.
Indian tribes retain broad residual power over intramural affairs: they may determine tribal membership, regulate domestic relations among members, prescribe rules of inheritance among members, and punish tribal offenders. Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). “They may also exclude outsiders from entering tribal land.” Plains Commerce, 554 U.S. at 327-28, 128 S.Ct. 2709 (citing Duro v. Reina, 495 U.S. 676, 696-97, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990)). “Conversely, when a tribal government goes beyond matters of internal self-governance and enters into an off-reservation business transaction with non-Indians, its claim of sovereignty is at its weakest.” San Manuel, 475 F.3d at 1312-13 (citing Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148-49, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)).
The Supreme Court has long been suspicious of tribal authority to . regulate the activities of non-members and is apt to view such power as implicitly divested, even in the absence of congressional action. See Plains Commerce, 554 U.S. at 328, 128 S.Ct. 2709 (“[T]he tribes have, by virtue of their incorporation into the American republic, lost ‘the right of governing ... personfs] within their limits except themselves.’ ” (second and third alteration in original) (quoting Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 209, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978))); see also COHEN’S HANDBOOK OF FEDERAL INDIAN LAW § 4.02(3), at 226-42 (Nell Jessup Newton ed., 2012) (hereinafter COHEN’S HANDBOOK). The Supreme Court has found implicit di *545 vestiture in areas of tribal criminal jurisdiction, see Oliphant, 435 U.S. at 195, 98 S.Ct. 1011, civil legislative jurisdiction, see Atkinson Trading Co. v. Shirley, 532 U.S. 645, 659, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001); Montana, 450 U.S. at 557, 101 S.Ct. 1245, and civil adjudicative jurisdiction, see Plains Commerce, 554 U.S. at 336, 341, 128 S.Ct. 2709; Nevada v. Hicks, 533 U.S. 353, 357-58, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001); Strate v. A-1 Contractors, 520 U.S. 438, 456-59, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).
Montana charts the contemporary law of implicit divestiture of inherent tribal sovereignty. See 450 U.S. at 565-66, 101 S.Ct. 1245. Montana held that the inherent sovereignty of the Crow Indian Tribe did not encompass regulation of non-Indian fishing and hunting on reservation land owned in fee by non-members of the tribe. See id. at 557, 101 S.Ct. 1245. In addressing the claim that the tribe’s residual inherent sovereignty included such power, the Montana Court set forth “the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe.” Id. at 565, 101 S.Ct. 1245 (citing Oliphant, 435 U.S. at 209, 98 S.Ct. 1011). Montana carved out two exceptions to this rule. First, “[a] tribe may regulate, through taxation, licensing, or other means, the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.” 450 U.S. at 565, 101 S.Ct. 1245. Second, “[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.” Id. at 566, 101 S.Ct. 1245. Montana made plain that tribal power over non-members extends only as far as “necessary to protect tribal self-government or to control internal relations.” Id. at 564, 101 S.Ct. 1245. Any exercise of tribal power over non-members beyond that point “is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.” Id. The Supreme Court has called Montana a “pathmarking case” on the subject of Indian tribes’ regulatory authority over non-members. See Hicks, 533 U.S. at 358, 121 S.Ct. 2304 (citing Strate, 520 U.S. at 445, 117 S.Ct. 1404).
In Hicks and Plains Commerce, the Court further demarcated the bounds on tribal sovereignty to regulate the activities of non-members. Hicks held that a tribe’s inherent sovereignty does not extend to the regulation of state wardens executing a search warrant for evidence of an off-reservation violation of state law. 533 U.S. at 364, 121 S.Ct. 2304. The Supreme Court rejected that such regulation is essential to tribal self-government or internal relations and held that the tribe’s inherent sovereignty does not encompass regulatory and adjudicatory jurisdiction over state officers. See id. at 364, 374, 121 S.Ct. 2304. Applying Montana, the Hicks Court “explained that what is necessary to protect tribal self-government and control internal relations can be understood by looking at the examples of tribal power to which Montana referred: tribes have authority ‘[to punish tribal offenders,] to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.’ ” Id. at 360-61, 121 S.Ct. 2304 (alterations in original) (quoting Strate, 520 U.S. at 459, 117 S.Ct. 1404). Thus, Hicks narrowly draws the boundary of residual inherent sovereignty. See id. “Tribal assertion of regulatory authority over non-members must be connected to that right of the Indians to make their own laws and be *546 governed by them.” Id. at 361, 121 S.Ct. 2304.
Further, the Hicks Court diluted the claim that tribal sovereignty to regulate the activities of non-members necessarily flows from the power to exclude outsiders from entering tribal land. The Court denied “that Indian ownership suspends the ‘general proposition’ derived from Oli-phant that ‘the inherent sovereign powers of an Indian tribe do not extend to the activities of non-members of the tribe’ except to the extent ‘necessary to protect tribal self-government or to control internal relations.’ ” Id. at 359, 121 S.Ct. 2304 (quoting Montana, 450 U.S. at 564-65, 101 S.Ct. 1245), As the Hicks court explained, “[t]he ownership status of land ... is only one factor to consider in determining whether regulation of the activities of nonmembers is ‘necessary to protect tribal self-government or to control internal relations.’ ” Id.
Similarly, in Plains Commerce, the Court held that a tribal court lacked jurisdiction to adjudicate a discrimination claim concerning a non-Indian bank’s sale of fee land because “regulating the sale of non-Indian fee land” is not related to the sovereign interests of protecting tribal self-government or controlling internal relations. See 554 U.S. at 330, 336, 341, 128 S.Ct. 2709. The Plains Commerce Court narrowed the ambit of Montana ⅛ exceptions to be congruent with those interests, noting that “[tjhese exceptions are limited ones and cannot be construed in a manner that would swallow the rule or severely shrink it.” Id. at 330, 128 S.Ct. 2709 (citations omitted) (internal quotation marks omitted). The Supreme Court also clarified that the burden rests on the tribe to establish an exception to Montana's general rule. Id. (citing Atkinson, 532 U.S. at 654, 121 S.Ct. 1825).
Hicks and Plains Commerce demonstrate that the application of the Montana framework is guided by an overarching principle: inherent tribal sovereignty has a core and a periphery. At the periphery, the power to regulate the activities of non-members is constrained, extending only so far as “necessary to protect tribal self-government or to control internal relations.” Montana, 450 U.S. at 564, 101 S.Ct. 1245. Tribal regulations of non-member activities must “flow directly from these limited sovereign interests.” Plains Commerce, 554 U.S. at 335, 128 S.Ct. 2709,
B.
The Supreme Court has anticipated that federal statutes of general applicability may implicitly divest Indian tribes of their sovereign power to regulate the activities of non-members. See Tuscarora, 362 U.S. at 115-17, 80 S.Ct. 543. In Tuscarora, the Supreme Court declared that “it is now well settled by many decisions of this Court that a general [federal] statute in terms applying to all persons includes Indians and their property interests.” 362 U.S. at 116, 80 S.Ct. 543. Tmcarora presented the question of whether a portion of the Tuscarora Indian Nation’s lands could be condemned under the eminent domain powers of § 21 of the Federal Power Act, 16 U.S.C. §§ 836, 836a (2012). Id. at 115, 80 S.Ct. 543. The Tuscarora Indian Nation, relying on Elk v. Wilkins, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643 (1884), “argue[d] that § 21, being only a general act of Congress, does not apply to Indians or their lands.” 362 U.S. at 115, 80 S.Ct. 543. The Supreme Court explicitly rejected this argument, citing decisions holding that generally applicable federal statutes presumptively reach the property interests of individual members of Indians tribes where no provision “indicates that Indians are to be excepted.” Id, at 116-17, 80 *547 S.Ct. 543 (citing Okla. Tax Comm’n v. United States, 319 U.S. 598, 607, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943); Superintendent of Five Civilized Tribes v. Comm’r, 295 U.S. 418, 419-20, 55 S.Ct. 820, 79 L.Ed. 1517 (1935)). The Tusearora Court extended these decisions applying general federal statutes to individual members of Indian tribes to hold that the eminent domain powers of the Federal Power Act, a statute creating a comprehensive regulatory scheme, reached lands purchased and owned in fee simple by the Tusearora Indian Nation. See id. at 118, 80 S.Ct. 543.[1]
Our sister circuits have long read Tuscarora for the proposition that a federal statute creating a comprehensive regulatory scheme presumptively applies to Indian tribes. See, e.g., Solis v. Matheson, 563 F.3d 425, 430 (9th Cir.2009); United States v. Mitchell, 502 F.3d 931, 947-48 (9th Cir.2007); NLRB v. Chapa De Indian Health Program, Inc., 316 F.3d 995, 998-99 (9th Cir.2003); Taylor v. Ala. Intertribal Council Title IV J.T.P.A., 261 F.3d 1032, 1034-35 (11th Cir.2001); United States v. Wadena, 152 F.3d 831, 841-42 (8th Cir.1998); Cook v. United States, 86 F.3d 1095, 1097 (Fed.Cir.1996); United States v. Funmaker, 10 F.3d 1327, 1330-31 (7th Cir.1993); E.E.O.C. v. Fond du Lac Heavy Equip. & Const. Co., Inc., 986 F.2d 246, 248 (8th Cir.1993); U.S. Dep’t of Labor v. Occupational Safety & Health Review Comm’n, 935 F.2d 182, 183-84 (9th Cir.1991); United States v. White, 508 F.2d 453, 455 (8th Cir.1974).
We stress that the application of general federal statutes to Indian tribes is presumptive; they do not always apply. See, e.g., Michigan v. Bay Mills Indian Cmty., — U.S. —, 134 S.Ct. 2024, 188 L.Ed.2d 1071 (2014). Our sister circuits have developed and employed a test, set forth in Coeur d Aleñe, to determine the exceptions to the presumptive application of a general federal statute. See 751 F.2d at 1116. In Coeur d'Alene, the Ninth Circuit held that the Occupational Safety and Health Act (“OSHA”) applied to commercial activities carried out by an Indian tribal farm that employed some non-member workers and was similar in its operation to other farms in the area. 751 F.2d at 1114. The court rejected the notion that “congressional silence should be taken as an expression of intent to exclude tribal enterprises from the scope of an Act to which they would be subject otherwise.” Id. at 1115. Citing Tusearora, the court applied the presumption that “federal laws generally applicable throughout the United States apply with equal force to Indians on reservations.” Id. (quoting United States v. Farris, 624 F.2d 890, 893 (9th Cir.1980)). The court, however, held that this presumption is limited by three exceptions.
*548 A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches exclusive rights of self-governance in purely intramural matters; (2) the application of the law to the tribe would abrogate rights guaranteed by Indian treaties; or (3) there is proof by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations.
Id. at 1116 (internal quotations omitted). “In any of these three situations, Congress must expressly apply a statute to Indians before ... it reaches them.” Id. (emphasis original). Because the tribe could not show that the application of OSHA regulations to its commercial farm fell within one of these three exceptions, the court held that OSHA applied. See id. at 1116-18.
Our sister circuits have employed the framework set forth in Coeur d’Alene to conclude that aspects of inherent tribal sovereignty can be implicitly divested by comprehensive federal regulatory schemes that are silent as to Indian tribes. See, e.g., Menominee Tribal Enters. v. Solis, 601 F.3d 669, 674 (7th Cir.2010) (holding that OSHA applied to tribe’s operation of a sawmill and related commercial activities); Fla. Paraplegic Ass’n v. Miccosukee Tribe of Indians, 166 F.3d 1126, 1128-30 (11th Cir.1999) (holding Title III of the Americans with Disabilities Act applied to tribe’s restaurant and gaming facility); Reich v. Mashantucket Sand & Gravel, 95 F.3d 174, 177-82 (2d Cir.1996) (holding that OSHA applied to Indian tribe’s construction business which operated only within confines of reservation); Smart v. State Farm Ins. Co., 868 F.2d 929, 932-36 (7th Cir.1989) (applying Employee Retirement Income Security Act to tribal employee benefits plan because statute did not affect tribe’s ability to govern itself in intramural matters); see also Navajo Tribe v. NLRB, 288 F.2d 162, 165 (D.C.Cir.1961) (holding that NLRA applies to employers located on reservation lands); cf. EEOC v. Fond du Lac Heavy Equip. & Constr. Co., 986 F.2d 246, 249 (8th Cir.1993) (holding that Age Discrimination in Employment Act, although generally applicable to Indian tribes, does not apply to employment discrimination action involving member of Indian tribe, tribe as employer, and reservation employment because “dispute involves a strictly internal matter” and application would affect “tribe’s specific right of self-government”); but see Pueblo of San Juan, 276 F.3d at 1199 (holding that federal statutes of general applicability do not apply where Indian tribe has exercised its authority as sovereign).
C.
The Band contends that the Coeur d’Al-ene framework insufficiently protects inherent tribal sovereignty. According to the Band, generally applicable congressional statutes cannot preempt any exercise of a tribal government’s inherent sovereign authority without a clear expression from Congress. We are not persuaded.
The Band principally cites Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), and Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), for its contention. In Iowa Mutual, the Supreme Court refused to read the statute granting federal diversity jurisdiction, 28, U.S.C. § 1332, which is silent as to Indian tribes, to nullify the requirement that tribal court remedies must be exhausted before a federal district court could assert jurisdiction. See 480 U.S. at 18, 107 S.Ct. 971. The Court cited the absence of clear congressional intent to the contrary. Id. at 17-18, 107 S.Ct. 971. And in Santa Clara Pueblo, the Supreme Court held that Title I of the *549 Indian Civil Rights Act of 1968, 25 U.S.C. § 1302, does not implicitly authorize a private cause of action for declaratory and injunctive relief against a tribal officer. 436 U.S. at 72, 98 S.Ct. 1670. There, a female member brought an action in federal district court, alleging that a tribal ordinance denying membership to children of female members who married outside of the tribe, but not to similarly situated children of male members, violated Title I. Id. at 52-53, 98 S.Ct. 1670. The Court found that construing § 1302 to create an implicit private right of action would interfere with tribal self-government beyond the interference expressly called for by the statute. Id. at 59, 98 S.Ct. 1670. Out of respect for tribal sovereignty and the plenary power of Congress, the Court reasoned that the statutory scheme and legislative history suggested that Congress’s refusal to provide remedies other than ha-beas corpas was deliberate. Id. at 61, 98 S.Ct. 1670.
To be sure, each decision declined to read a congressional statute in a way that would undermine central aspects of tribal self-government absent a clear statement that it was Congress’s intent to do so. But these decisions hardly show that every congressional statute of general applicability that would conflict with any tribal regulation of the activities of nonmembers must be accompanied by a clear statement if that federal statute is to apply. We do not even accord the sovereign powers of the several states—which, unlike the sovereign powers of Indian tribes, are constitutionally protected—-with such solicitude. See, e.g., Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (discussing doctrine of implied preemption); Gibbons v. Ogden, 22 U.S. 1, 211, 9 Wheat. 1, 6 L.Ed. 23 (1824) (‘[A]cts of the State Legislatures ... enacted in the execution of acknowledged State powers, [that] interfere with, or are contrary to the laws of Congress ... must yield to [the latter].”).
Comprehensive federal regulatory schemes that are silent as to Indian tribes can divest aspects of inherent tribal sovereignty to govern the activities of non-members. We do not doubt that “Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.” Wheeler, 435 U.S. at 323, 98 S.Ct. 1079. Yet, such residual sovereignty is “unique and limited.” Id. As explained above, the Supreme Court has held several aspects of tribal sovereignty to regulate the activities of nonmembers to be implicitly divested, even in the absence of congressional action, and it is axiomatic that tribal sovereignty is “subject to complete defeasance” by Congress. It would be anomalous if certain aspects of tribal sovereignty—namely, specific powers to regulate some non-member activities—are implicitly divested in the absence of congressional action, see generally COHEN’S HANDBOOK § 4.02(3), at 226-42, but those same aspects of sovereignty could not be implicitly divested by generally applicable congressional statutes.
For these reasons, we do not agree with the Band’s reliance on NLRB v. Pueblo of San Juan, 276 F.3d 1186 (10th Cir.2002) (en banc), in which the Tenth Circuit held that federal statutes of general applicability do not presumptively apply “where an Indian tribe has exercised its authority as a sovereign ... rather than in a proprietary capacity such as that of employer or landowner.” Id. at 1199. The Band reads Pueblo of San Juan to suggest that Indian tribes may avoid the presumptive application of a comprehensive federal regulatory scheme by enacting an ordinance regulating the activities of nonmembers that directly conflicts with the *550 federal statute. But, again, this cannot be the rule. Tribal regulations of the activities of non-members are enacted at the frontier of tribal sovereignty. See Plains Commerce, 554 U.S. at 328, 128 S.Ct. 2709; Montana, 450 U.S. at 564, 101 S.Ct. 1245. Again, not even the states—whose sovereign powers are explicitly protected by the Tenth Amendment—may avoid the application of federal law by enacting directly conflicting legislation. See U.S. Const, art. VI, cl. 2; Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 713, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985); see also Pueblo of San Juan, 276 F.3d at 1205 (Murphy, J., dissenting). “The tribes’ retained sovereignty reaches only that power ‘needed to control .,. internal relations!),] ... preserve their own unique customs and social order], and] ... prescribe and enforce rules of conduct for [their] own members.’ ” Mashantucket Sand & Gravel, 95 F.3d at 178 (alterations in original) (quoting Duro, 495 U.S. at 685-86, 110 S.Ct. 2053). A clear statement is required for a statute to undermine central aspects of tribal self-government—that is, a tribe’s ability to govern its own members. See Iowa Mut., 480 U.S. at 17-18, 107 S.Ct. 971; Santa Clara Pueblo, 436 U.S. at 59-61, 98 S.Ct. 1670; see also Bay Mills, 134 S.Ct. at 2031-32 (describing the “enduring principle of Indian law” that “courts will not lightly assume that Congress in fact intends to undermine Indian self-government,” and holding that tribal immunity from suit is a central aspect of self-government that requires a clear statement by Congress if it is to be abrogated). A clear statement is not required, however, for a federal statute of general applicability creating a comprehensive regulatory scheme to apply to a tribe’s regulation of the activities of non-members where such regulation is not necessary to the preservation of tribal self-government. The Band suggests that every federal statute that fails to expressly mention Indian tribes would not apply to them. Contrary to the Band’s proposed rule, the nature and limits of residual tribal sovereignty entail the presumption that federal statutes apply to Indian tribes’ regulation of the activities of nonmembers where such tribal regulation is not “necessary to protect tribal self-government or to control internal relations.” See Montana, 450 U.S. at 564, 101 S.Ct. 1245.
The Band also points to the separate canon of construction that ambiguities in a federal statute must be resolved in favor of Indians. See Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Mich., 369 F.3d 960, 971 (6th Cir.2004). But “canons are not mandatory rules[;] they are guides that ‘need not be conclusive.’ ” Chickasaw Nation v. United States, 534 U.S. 84, 94, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (quoting Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115, 121 S.Ct 1302, 149 L.Ed.2d 234 (2001)). The Band asserts that this canon is “rooted in the unique trust relationship between the United States and the Indians.” See Grand Traverse Band, 369 F.3d at 971 (quoting Blackfeet Tribe, 471 U.S. at 766, 105 S.Ct. 2399). But it does not undermine that trust relationship to presumptively apply a federal statute of general applicability to a tribe’s regulation of the activities of non-members where the tribal regulation is not necessary to the preservation of tribal self-government. See Montana, 450 U.S. at 564, 101 S.Ct. 1245; Wheeler, 435 U.S. at 323, 98 S.Ct. 1079. Furthermore, the cases the Band cites in support of the canon that statutory ambiguities must be construed in favor of Indians involved a statute or provision of a statute that Congress enacted specifically *551 for the benefit of Indians or for the regulation of Indian affairs. See, e.g., Blackfeet, 471 U.S. at 766, 105 S.Ct. 2399 (Indian Mineral Leasing Acts of 1924 and 1938); Grand Traverse Band, 369 F.3d at 971 (IGRA). Like the D.C. Circuit, we have found no case in which the Supreme Court applied this canon to resolve an ambiguity in a statute of general application silent as to Indians, like the NLRA. See San Manuel, 475 F.3d at 1312.
D.
We find that the Coeur d'Alene framework accommodates principles of federal and tribal sovereignty. See Mashantucket Sand & Gravel, 95 F.3d at 179; Pueblo of San Juan, 276 F.3d at 1206 (Murphy, J., dissenting) (“A limited notion of tribal self-governance preserves federal supremacy over Indian tribes while providing heightened protection for tribal regulation of purely intramural matters. Any concerns about abrogating tribal powers ... are fully addressed by the Coeur d’Al-ene exceptions.”). The Coeur d’Alene framework reflects the teachings of Montana., Iowa Mutual, and Santa Clara Pueblo: there is a stark divide between tribal power to govern the identity and conduct of its membership, on the one hand, and to regulate the activities of nonmembers, on the other. The Coeur d’Al-ene framework begins with a presumption that generally applicable federal statutes also apply to Indian tribes, reflecting Congress’s power to modify or even extinguish tribal power to regulate the activities of members and non-members alike. See 751 F.2d at 1115; cf. Montana, 450 U.S. at 557, 101 S.Ct. 1245. The exceptions enumerated by Coeur d’Alene then supply Indian tribes with the opportunity to show that a generally applicable federal statute should not apply to them. The first exception incorporates the teachings of Iowa Mutual and Santa Clara Pueblo that if a federal statute were to undermine a central aspect of tribal self-government, then a dear statement would be required. By this mechanism, the Coeur d’Alene framework preserves “the unique trust relationship between the United States and the Indians.” Grand Traverse Band, 369 F.3d at 971 (quoting Blackfeet Tribe, 471 U.S. at 766, 105 S.Ct. 2399). We therefore adopt the Coeur d’Alene framework to resolve this case.
IV.
The NLRA is a generally applicable, comprehensive federal statute. It prohibits “employers” from engaging in unfair labor practices and empowers the Board to prevent such practices. 29 U.S.C. §§ 158(a), 160(a). Congress has said that “[t]his power shall not be affected by any other means of adjustment or prevention that has been or may be established by law, or otherwise.” § 160(a). The Supreme Court “has consistently declared that in passing the [NLRA], Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause.” NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S.Ct. 312, 9 L.Ed.2d 279 (1963) (citing Guss v. Utah Labor Relations Bd,, 353 U.S. 1, 3, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957)). Under the Coeur d’Alene framework, since there is no treaty right at issue in this case, the NLRA applies to the Band’s operation of the casino unless the Band can show either that the Board’s exercise of jurisdiction “touches exclusive rights of self-governance in purely intramural matters” or that “there is proof by legislative history or some other means that Congress intended [the NLRA] not to apply to Indians on their reservations.” 751 F.2d at 1116.
*552 A.
The Band cannot show that application of the NLRA to the casino undermines “tribal self-governance in purely intramural matters,” Id, The Band underscores the provisions of Articles XVI and XVII that regulate non-member employee strikes, the Band’s duty to bargain in good faith over the terms and conditions under which the Band’s employees may be tested for alcohol and drug use, and the licensing of non-member labor organizations seeking to organize Band employees. The Band argues that these regulations in particular implicate its “right of self-governance in purely intramural affairs.” Coeur d’Alene, 751 F.2d at 1116. The Band forwards two arguments for its contention that application of the NLRA undermines its right of self-governance: first, the regulations targeted by the Board’s order protect the net revenues of the casino, which, pursuant to the IGRA, fund its tribal government. Second, the Band stresses that application of the NLRA would invalidate a regulation enacted and implemented by its Tribal Council.
The tribal self-governance exception is designed to except internal matters such as the conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes also apply to Indian tribes. Id. (citing Farris, 624 F.2d at 893); cf. Montana, 450 U.S. at 564, 101 S.Ct. 1245 (holding that Indian tribes retain sovereign power to determine tribal membership, to regulate domestic relations among members, to prescribe rules of inheritance among members, and to punish tribal offenders). Intramural matters concern conduct the immediate ramifications of which are felt primarily within the reservation by members of the tribe. Mashantucket Sand & Gravel, 95 F.3d at 181. We find that Articles XVI and XVII, even the provisions the Band underscores, do not regulate purely intramural matters; rather, they principally regulate the labor-organizing activities of Band employees, and specifically of casino employees, most of whom are not Band members. For this reason, the Band’s enactment of Articles XVI and XVII is unlike those exercises of tribal government that our sister circuits have found to concern purely intramural affairs. See, e.g., Reich v. Great Lakes Indian Fish & Wildlife Comm’n, 4 F.3d 490, 495 (7th Cir.1993); Fond du Lac, 986 F.2d at 249.
In Fond du Lac, the court refused to apply ADEA to an employment discrimination action involving a tribe member, employed by the tribe on the reservation, because the “dispute involvefd] a strictly internal matter.” 986 F.2d at 249. In Great Lakes, the court refused to apply the overtime requirements of the Fair Labor Standards Act to tribal law-enforcement officers. 4 F.3d at 495. The Great Lakes court distinguished tribal law-enforcement employees from tribal employees in other cases who “were engaged in routine activities of a commercial or service character, namely lumbering and health care, rather than of a governmental character.” Id. Further, the court explicitly did “not hold that employees of Indian agencies are exempt from the Fair Labor Standards Act.” Id. Because Articles XVI and XVII regulate the activities of nonmember, non-officer employees, the Band’s reliance on Fond du Lac and Great Lakes is unavailing. Articles XVI and XVII are far removed from regulations of intramural matters envisioned by courts applying the first Coeur d’Alene exception. See, e.g., Mashantucket Sand & Gravel, 95 F.3d at 181; Coeur d’Alene, 751 F.2d at 1116.
The Band responds that Article XVI targets those non-member aetivi *553 ties—particularly casino employee strikes and labor-organizing efforts—that jeopardize the revenues of its tribal government and thus threaten its tribal self-sufficiency. This argument overreaches. “A statute of general application will not be applied to an Indian Tribe when the statute threatens the Tribe’s ability to govern its intramural affairs, but not simply whenever it merely affects self-governance as broadly conceived.” Smart, 868 F.2d at 935. The right to conduct commercial enterprises free of federal regulation is not an aspect of tribal self-government. See, e.g., Fla. Paraplegic Ass’n, 166 F.3d at 1129 (finding tribal gaming facility “does not relate to the governmental functions of the Tribe”); U.S. Dep’t of Labor v. Occupational Safety & Health Review Comm’n (OSHRC), 935 F.2d 182, 184 (9th Cir.1991) (citing Coeur d’Alene, 751 F.2d at 1116). And Indian tribes are not shielded from general federal statutes because the application of those statutes may incidentally affect the revenue streams of tribal commercial operations that fund tribal government. See Coeur d’Alene, 751 F.2d at 1116 (rejecting the argument that applying OSHA to tribal farm would interfere with right of self-government because “it would bring within the embrace of ‘tribal self-government’ all tribal business and commercial activity”); see also Solis, 601 F.3d at 671 (rejecting argument that tribal sawmill involved right of self-governance in purely intramural affairs because “[t]he Menominees’ sawmill is just a sawmill, a commercial enterprise”); OSHRC, 935 F.2d at 184 (holding that although revenue from tribal lumber mill, which employed significant number of non-members and sold its products broadly in interstate commerce, was “critical to the tribal government, application of [OSHA] does not touch on the Tribe’s ‘exclusive rights of self-governance in purely intramural matters’ ” (quoting Coeur d’Alene, 751 F.2d at 1116)). Moreover, the Band’s contention inverts the presumption of the applicability of federal statutes, which, as explained above, is grounded on the Montana presumption that tribes lack the inherent power to govern the activities of nonmembers. See 450 U.S. at 565, 101 S.Ct. 1245.
The Band emphasizes that the tribal commercial activity at issue is not a farm, sawmill, or lumber mill, but a sophisticated casino gaming operation, operated in accordance with federal approval under the IGRA, funding approximately fifty percent of the Band’s tribal government. We do not find that the IGRA renders commercial gaming an untouchable aspect of tribal self-governance, leaving the Band to operate gaming enterprises free from all other federal regulations. We recognize that Congress’s explicit goal in enacting the IGRA is “to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal government.” 25 U.S.C. § 2702(1) (policy statement). Indeed, under the IGRA, the net revenue from the Band’s gaming operations is not to be used for other purposes. See 25 U.S.C. § 2710(b)(2). The IGRA protects gaming as a source of tribal revenue from organized crime and other corrupting influences. 25 U.S.C, § 2702(2)-(3) (policy statement). It does not, however, immunize the operation of Indian commercial gaming enterprises from the application of other generally applicable congressional statutes. See Chickasaw Nation, 534 U.S. at 86-89, 122 S.Ct. 528 (holding that the IGRA section providing that Indian gaming operations, like state gaming operations, must report certain player winnings to the federal government, and must likewise withhold federal taxes if players’ winnings exceed certain level, did not give rise to negative inference that Congress in *554 tended to exempt Indian tribes from federal wagering excise taxes imposed by chapter 35 of the Internal Revenue Code); see also Chickasaw Nation v. United States, 208 F.3d 871, 881-84 (10th Cir.2000), aff'd, 534 U.S. 84, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001). In Chickasaw Nation, the Tenth Circuit directly addressed the import of the IGRA’s policy statement. The court held that “the statute’s statement of purpose does not, in and of itself, demonstrate any type of Congressional intent to place tribal gaming revenues beyond the reach of federal wagering excise or federal occupational taxes.” Id. at 881. The same may be said of the NLRA, the application of which affects the net tribal revenue from the IGRA gaming operations in a more tangential and less certain way than the application of title 35 of the Internal Revenue Code. Cf. San Manuel, 475 F.3d at 1315 (finding that “[t]he total impact ... at issue here amounts to some unpredictable, but probably modest, effect on tribal revenue”). The IGRA provides a statutory basis to regulate tribal gaming activities, but from that fact it does not follow that Congress intended that no other federal regulations apply to a tribe’s operation of a commercial gaming facility. See San Manuel, 475 F.3d at 1318.
We do not read California v. Cabazon Band of Mission Indians, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), or New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983), to require a contrary result. Those cases, decided before the enactment of the IGRA, held that state regulatory jurisdiction did not reach Indian tribes because federal interests in tribal self-government and economic development predominate. See Cabazon, 480 U.S. at 216-22, 107 S.Ct. 1083; Mescalero, 462 U.S. at 341-344, 103 S.Ct. 2378. But the relationship between the federal government and the Indian tribes is vastly different than the relationship between the states and the Indian tribes. Cabazon and Mescalero cannot be stretched to suggest that comprehensive, federal regulatory schemes do not presumptively apply to tribal commercial enterprises, even where those enterprises are both regulated by and fund tribal governments.
The Band also argues that because the Board’s exercise of jurisdiction undermines a general enactment of its tribal government, application of the NLRA would undermine its right of self-governance in purely intramural matters. But again, it cannot be the rale that, unlike states, a tribal government may avoid application of a generally applicable federal statute by enacting a regulation governing the activities of non-members and members alike. See Pueblo of San Juan, 276 F.3d at 1205 (Murphy, J., dissenting). The Band rejoins that the enactment and implementation of Articles XVI and XVII to govern labor relations of its own citizens is “inextricably intertwined” with its ability to apply identical legal standards to nonmember employees. We reject the notion that the Band’s authority to govern the activities of its own citizens is coextensive with the Band’s authority to govern the activities of non-members. See Montana, 450 U.S. at 564-66, 101 S.Ct. 1245; Fletcher, 10 U.S. at 87. We also doubt that the Band’s Tribal Council lacks the ability to enact legislation exclusively governing the labor and organizing rights of Band members if its saw fit to do so. At bottom, the Band’s “inextricably intertwined” argument is a rule-swallower. Cf. Plains Commerce, 554 U.S. at 330, 128 S.Ct. 2709 (stating that the exceptions permitting an Indian tribe’s regulation of non-member activities “cannot be construed in a matter that would swallow the rule” expressed in Montana that tribal power over non-members is implicitly divested). Tribal regula *555 tion that targets the activities of both members and nonmembers does not ipso facto trump a generally applicable federal regulation. To establish a contrary rule would swallow the presumption that federal statutes of general applicability also apply to Indian tribes.
B.
The Band submits that there is proof that Congress intended the NLRA not to apply to Indians on their reservations and, hence, this case falls within the third Coeur d’Alene exception. See Coeur d’Alene, 751 F.2d at 1116. The “proof’ the Band offers is Congress’s decision not to include Indian nations within Section 301 of the NLRA, which provides a private right of action for “violation of contracts between an employer and a labor organization.” 29 U.S.C. § 185(a). The Band argues that since Congress did not waive tribal sovereign immunity when it created a private right of action to enforce collective-bargaining agreements, it must be that no provision in the NLRA applies to Indian tribes.
 We cannot agree. We recognize that Indian tribes are immune from suit in both state and federal court unless “Congress has authorized the suit or the tribe has waived its immunity.” Kiowa Tribe v. Mfg. Techs., Inc., 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998). Indian tribes, however, have no sovereign immunity against the United States. Fla. Paraplegic Ass’n, 166 F.3d at 1135 (citing Mashantucket Sand & Gravel, 95 F.3d at 182); see also United States v. Red Lake Band of Chippewa Indians, 827 F.2d 380, 382 (8th Cir.1987). Furthermore, Congress may choose to impose an obligation on Indian tribes without subjecting them to the enforcement of that obligation through a private right of action. See Santa Clara Pueblo, 436 U.S. at 65, 98 S.Ct. 1670 (finding that although the Indian Civil Rights Act of 1968 did not waive tribal immunity, the act nevertheless imposes obligations on tribes which may be enforced through vehicles other than private right of action); Fla. Paraplegic Ass’n, 166 F.3d at 1134. That choice, however, simply does not evince Congress’s intent that a statute not impose obligations on Indian tribes or that those obligations not be enforced by other means, for example, by agency action. See Santa Clara Pueblo, 436 U.S. at 65, 98 S.Ct. 1670; Fla. Paraplegic Ass’n, 166 F.3d at 1134. The fact that Congress did not waive tribal sovereign immunity from private suits to enforce collective-bargaining agreements under Section 301 in no way suggests that the Band is immune from suits by the Board to enforce other requirements imposed by NLRA.
In sum, we find that this ease does not fall within the exceptions to the presumptive applicability of a general statute outlined in Coeur d’Alene. The NLRA does not undermine the Band’s right of self-governance in purely intramural matters, and we find no indication that Congress intended the NLRA not to apply to a tribal government’s operation of tribal gaming, including the tribe’s regulation of the labor-organizing activities of non-member employees.
C.
The NLRA excepts “any State or political subdivision thereof’ from the definition of “employer.” See 29 U.S.C. § 152(2). The Band’s final contention is that, in light of comity principles, we must interpret the NLRA to treat Indian tribes exercising sovereign functions within their reservation and trust lands the same way that the NLRA treats states. But the Band is not a state, and tribal sovereignty and state sovereignty are built on different *556 foundations and are accorded different protections in our constitutional order. See Plains Commerce, 554 U.S, at 337, 128 S.Ct. 2709; Lara, 541 U.S. at 212, 124 S.Ct. 1628 (Kennedy, J., concurring); Merrion, 455 U.S. at 172-73, 102 S.Ct. 894 (Stevens, J., dissenting). Thus we do not presume that when Congress excepted the states from the coverage of the term “employer” under § 152(2), it necessarily also intended to except the Indian tribes. Furthermore, if Congress intended to include Indian tribes within its explicit list of exceptions to “employer,” it would have done so. See San Manuel, 475 F.3d at 1317 (holding that “the Board could reasonably conclude that Congress’s decision not to include an express exception for Indian tribes in the NLRA was because no such exception was intended or exists”). We do not interpret the NLRA’s exception for the states and their political subdivisions to encompass the Band. Accordingly, we hold that the Act applies.
V.
The application for enforcement is granted.

. Merrion also suggests that federal statutes of general applicability may implicitly divest Indian tribes of their sovereign power to regulate the activities of non-members. See Merrion, 455 U.S. at 152, 102 S.Ct. 894. Before concluding that there was no indication that the tribe’s power to enact an ordinance taxing non-member removal of oil and natural gas from tribal lands had been abrogated by Congress, the Merrion Court examined whether any particular provision in two federal statutes "deprived the Tribe of its authority to impose the severance tax.” 455 U.S. at 149, 102 S.Ct. 894. After reviewing the text and legislative history of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3320(a), (c)(1), repealed by Pub.L. No. 101-60, § 2(b), 103 Stat, 158 (1989), the Court found "no 'clear indications’ that Congress has implicitly deprived the Tribe of its power to impose the severance tax." Id. at 152, 102 S.Ct 894 (emphasis added). Although the Court held that Congress had not implicitly divested the tribe of its authority to impose a severance tax, the Court's analysis presumes that Congress could do so. See id. at 152, 102 S.Ct. 894; see also Pueblo of San Juan, 276 F.3d 1186, 1204 (10th Cir.2002) (en banc) (Murphy, J., dissenting).