RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0001p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

NORBERT J. KELSEY,

*Petitioner-Appellee,*

v.

No. 14-1537

MELISSA LOPEZ POPE, et al.,

*Respondents,*

DANIEL T. BAILEY, Chief Judge of the Little River
Band of Ottawa Indians Tribal Court,

*Respondent-Appellant.*

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:09-cv-01015—Gordon J. Quist, District Judge.

Argued: October 8, 2015

Decided and Filed: January 5, 2016

Before: ROGERS and McKEAGUE, Circuit Judges; SARGUS, District Judge.[*]

───────────────

## COUNSEL

**ARGUED:** Riyaz A. Kanji, KANJI & KATZEN, PLLC, Ann Arbor, Michigan, for Appellant.
Alistair E. Newbern, VANDERBILT APPELLATE LITIGATION CLINIC, Nashville,
Tennessee, for Appellee. **ON BRIEF:** Riyaz A. Kanji, KANJI & KATZEN, PLLC, Ann Arbor,
Michigan, Dan Himmelfarb, MAYER BROWN LLP, Washington, D.C., for Appellant. Alistair
E. Newbern, VANDERBILT APPELLATE LITIGATION CLINIC, Nashville, Tennessee, for
Appellee. Eugene R. Fidell, New Haven, Connecticut, John L. Smeltzer, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., Ruthanne M. Deutsch, GEORGETOWN

───────────────

[*]The Honorable Edmund A. Sargus, Jr., Chief United States District Judge for the Southern District of
Ohio, sitting by designation.

1

UNIVERSITY LAW CENTER APPELLATE LITIGATION PROGRAM, Washington, D.C., for Amici Curiae.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.   Norbert Kelsey, a member of the Little River Band of Ottawa Indians (the "Band"), was convicted in tribal court of misdemeanor sexual assault for inappropriately touching a tribal employee at the Band's Community Center.   The Community Center is located on land owned by the Band but is not located within tribal reservation boundaries.   Kelsey appealed his sentence in tribal court, arguing that the Band lacked criminal jurisdiction over his off-reservation conduct.   After his sentence was affirmed, he filed a petition for habeas relief in United States District Court, arguing that the Band lacked jurisdiction over his off-reservation conduct and that his appeal in tribal court violated due process protections afforded by the Indian Civil Rights Act.   *See* 25 U.S.C. § 1302(a)(8).

The district court granted habeas relief, holding that the Band lacked criminal jurisdiction to try and punish Kelsey's off-reservation conduct but declined to rule on Kelsey's due process challenge.   We reverse and hold that the Band has jurisdiction because it has not been expressly or implicitly divested of its inherent sovereign authority to prosecute members when necessary to protect tribal self-government or control internal relations.   We also hold that Kelsey's due process challenge under the Indian Civil Rights Act fails.   Accordingly, we vacate the district court's decision to grant habeas relief.

**I**

*The Band's Governmental Structure.*   The Band is a federally recognized Indian tribe, 25 U.S.C. § 1300k-2(a), located in northwest Michigan's Manistee and Mason Counties.   *Id.* at § 1300k-4(b); *see also Grand Traverse Band of Ottawa and Chippewa Indians v. Office of U.S. Att'y for the W. Dist. of Mich.*, 369 F.3d 960, 961–62 (6th Cir. 2004) (providing an extensive historical discussion of the relationship between the federal government and the Band dating back to the Treaty of Greenville in 1795).   Pursuant to federal recognition, "all laws and

regulations of the United States of general application to Indians or nations, tribes, or bands of Indians, including the . . . 'Indian Reorganization Act'" are applicable to the Band. 25 U.S.C § 1300k-2(a). Under federal law, Indian tribes "shall retain inherent sovereign power," 25 U.S.C. § 476(h)(1), with "the inherent authority to establish their own form of government, including tribal justice systems." 25 U.S.C. § 3601(4). Section 1300k-6 governs the establishment of the Band's constitution, which includes the creation of its tribal justice system. *Id.*

The Band has adopted a strict separation-of-powers Constitution, including an independent Tribal Judiciary. R. 1-6, Tribal Constitution, art. VI, § 9, PID 57. Article VI, Section 8 of the Tribal Constitution enumerates the judicial power of the Tribal Court, vesting the Tribal Court with the authority "[t]o adjudicate all civil and criminal matters arising within the jurisdiction of the Tribe or to which the Tribe or an enrolled member of the Tribe is a party." *Id.* Additionally, the Band's Constitution extends the power of judicial review to the Tribal Court "[t]o review ordinances and resolutions of the Tribal Council . . . and rule void those ordinances and resolutions deemed inconsistent" with the Band's Constitution. *Id.*

On July 5, 2005, Heidi Foster, an employee of the Band's medical clinic and member of a neighboring tribe, attended a meeting of tribal elders at the Band's Community Center. The Community Center, located just across the street from the reservation, is constructed on land purchased by the Band in fee simple in 1997 but is not within "Indian country" as defined by 18 U.S.C. § 1151. At this meeting, Kelsey, then an elected member of the Band's nine-person Tribal Council, made inappropriate physical contact of a sexual nature with Foster.

In June 2007, the Band charged Kelsey with misdemeanor sexual assault and harassment under its internal criminal laws. On January 21, 2008, the Tribal Court convicted Kelsey of sexual assault and subsequently sentenced him to six months in jail. The Tribal Court held his sentence in abeyance while Kelsey complied with the court-imposed probation requirements, including a $5,000 fine, community service, and a prohibition from speaking to female employees of the tribe. Less than two weeks after Kelsey's sentence, the Tribal Court entered a partial stay of the judgment pending appeal to the Tribal Court of Appeals.

On appeal, Kelsey challenged the Tribal Court's jurisdiction, arguing that the Band lacked authority to exercise criminal jurisdiction over his specific conduct because it occurred outside of the Band's Indian country. The Tribal Court of Appeals affirmed tribal criminal jurisdiction over Kelsey's offense based on the Band's inherent sovereign authority to prosecute its members. It also found that a jurisdictional mandate in the Tribal Constitution required extending jurisdiction to Kelsey's off-reservation conduct. In its order, the Tribal Court of Appeals noted the significant impact this case had on the Band's internal affairs and self-governance.[1]

The Tribal Court of Appeals also considered Kelsey's argument that the Band's own internal laws precluded jurisdiction, specifically a territorial limitation in Section 4.03 of the Band's Criminal Offenses Ordinance. The Court of Appeals reviewed that ordinance, found it inconsistent with jurisdiction in other internal ordinances and the Tribal Constitution, and removed Section 4.03's territorial limitation for being "unconstitutionally narrow." The Tribal Court of Appeals then rejected Kelsey's jurisdictional defense based on Section 4.03 and affirmed the Tribal Court's exercise of jurisdiction.

In November 2009, Kelsey filed a petition for a writ of habeas corpus in the Western District of Michigan, making two principal arguments: (1) the Band lacked inherent sovereign authority to assert criminal jurisdiction over his conduct because it occurred outside of the Band's Indian country, and (2) the Tribal Court of Appeals' decision to "change the Band's criminal laws and apply those laws retroactively" was unexpected and indefensible in violation of the due process protections under the Indian Civil Rights Act.

The petition was first considered by a magistrate judge, who concluded that the Band had been implicitly divested of any inherent authority to assert criminal jurisdiction over members for off-reservation conduct. Additionally, the magistrate judge determined that the Tribal Court of Appeals' decision to remove the territorial limiting provision in the Criminal Offenses

---

[1]"The interests of the Tribe are very strong here. This case involves a tribal member in an elected position acting as an agent of the Tribe at a Tribal activity who committed a crime against a Tribal employee in a public setting openly visible to other employees and Tribal members who were present. It also involves a Tribal Court finding that Defendant exercised political influence affecting the victim and the Tribe's welfare." R.9, Tribal Court App'x at 11–14, PID 1537–40. The Tribal Court of Appeals also referred to the "tribal nature of all the activities that have occurred at the Community center" due to its status as a "community gathering point." *Id.* at 1539.

Ordinance violated Kelsey's due process rights because it "retroactively" expanded tribal criminal jurisdiction over Kelsey's offense.

The district court adopted the magistrate judge's report and recommendation in part, holding that Indian tribes were implicitly divested of criminal jurisdiction over off-reservation member conduct, finding that issue dispositive, and declining to address Kelsey's due process claim.  R. 41, Opinion at 5–6, Page ID 584–85.  Accordingly, the district court granted habeas relief for lack of tribal jurisdiction.  *Id.*  Because Kelsey's probationary period is suspended pending resolution of this action, and because he is prevented from traveling outside of Michigan without Tribal Court permission at this time, he is in custody for purposes of this habeas action.  *McVeigh v. Smith*, 872 F.2d 725, 727 (6th Cir. 1989).

**II**

The question of "whether a tribal court has exceeded the lawful limits of its jurisdiction" is one arising under federal law.  *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 853 (1985); *see also Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 19 (1987) (holding that a tribal court's determination of its jurisdiction may be challenged in district court).  Because of this federal law analogue, habeas claims brought under the Indian Civil Rights Act, 25 U.S.C. § 1303, are most similar to habeas actions arising under 28 U.S.C. § 2241.  *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 890–91 (2nd Cir. 1996).  We review a district court's grant of habeas relief under § 2241 *de novo*.  *Rice v. White*, 660 F.3d 242, 249 (6th Cir. 2011).

**III**

*Governing Framework*.  We must assess whether the Band properly asserted extra-territorial criminal jurisdiction over Kelsey.  The Band has stipulated for the purposes of this action that the Community Center where Kelsey's conduct took place was not within the boundaries of "Indian country."[2] 18 U.S.C. § 1151 (2012) (defining "Indian country").

---

[2]Were that the case, the question of tribal jurisdiction would be a less complicated one of territorial jurisdiction.  Instead, Kelsey's conduct occurred on land held in fee simple outside the boundaries of Indian country (referred to throughout as "the reservation or reservation boundaries").  The jurisdictional question is thus one of *extra-territorial* application of criminal jurisdiction.

Both parties (and the supporting *amici*) accept the baseline proposition that, as dependent sovereigns, Indian tribes exercise inherent sovereign authority and retain "those aspects of inherent sovereignty not expressly limited by Congress or treaty or implicitly divested by virtue of their domestic dependent status." Kelsey Br. at 30 (citing *United States v. Wheeler*, 435 U.S. 313, 326 (1978)); *United States v. Doherty*, 126 F.3d 769, 778 (6th Cir. 1997) (abrogated on other grounds by *Texas v. Cobb*, 532 U.S. 162 (2001)); *see also* Band Br. at 19–20; Band Reply Br. at 3, Government Amicus Br. at 8. We therefore assess the question of extra-territorial criminal jurisdiction by breaking this governing framework into three separate inquiries: (1) do Indian tribes have inherent sovereign authority to exercise extra-territorial criminal jurisdiction? (2) If so, has that authority been expressly limited by Congress or treaty? And (3) if not, have the tribes been implicitly divested of that authority by virtue of their domestic dependent status?

## A

The inherent sovereignty of Indian tribes "preexisted the founding; it is neither derived from nor protected by the Constitution." *Nat'l Labor Relations Bd. v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 544 (6th Cir. 2015) (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 168 (1982) (Stevens, J., dissenting)) (internal quotation marks omitted). Indian tribes, however, no longer possess "the full attributes of sovereignty." *United States v. Kagama*, 118 U.S. 375, 380 (1886). While still exercising elements of "inherent sovereign authority," *Michigan v. Bay Mills Indian Community.*, 134 S. Ct. 2024, 2030 (2014), the tribes' "incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised." *Wheeler*, 435 U.S. at 323. Because of this dependent relationship with the United States, Congress wields power "consistently described as plenary and exclusive to legislate [with] respect to Indian tribes." *Bay Mills*, 134 S. Ct. at 2030. However, "unless and until Congress acts, the tribes retain their historic sovereign authority." *Id.* Before we look to whether Congress has expressly limited the tribes' criminal jurisdiction over their members, or whether such authority has been implicitly divested by the tribes' dependent status, we must first consider whether trying and punishing members for off-reservation conduct is an inherent aspect of tribal sovereignty.

**i**

*Competing Theories of Tribal Criminal Jurisdiction.*  The sovereign authority of a tribe to punish its own members is "a power that this Court has called inherent." *United States v. Lara*, 541 U.S. 193, 204 (2004) (citing *Wheeler*, 435 U.S. at 322–23) (internal quotation marks omitted).  *See also Little River Band*, 788 F.3d 537, 544 (6th Cir. 2015) ("Indian tribes retain broad residual powers of intramural affairs: they may . . . punish tribal offenders.").  The question pertinent to Kelsey's case, however, is whether this inherent authority to prosecute members extends beyond reservation boundaries.  The parties advance two competing theories as to how tribal criminal jurisdiction operates.  To the Band, the tribes have "inherent authority to prosecute tribal members for offenses substantially affecting [tribal] self-governance interests," even when such offenses take place outside of Indian country.  Band Br. at 3, 41–42.  Kelsey rejects this membership-based jurisdiction, arguing that sovereign authority (and thus criminal jurisdiction) is defined by the twin factors of tribal membership and territory—when either factor is absent, the tribe's inherent authority, in this case criminal jurisdiction, is greatly diminished or altogether absent.  Though our governing precedent has not specifically addressed this question, the Band's theory of membership-based jurisdiction is more persuasive.

In this relatively sparse area of law, the Band cobbles together support for membership-based jurisdiction from a variety of legal and historical sources.  The two most helpful cases in establishing membership as the driving force behind criminal jurisdiction are *Wheeler*, 435 U.S. 313 (1978), and *Duro v. Reina*, 495 U.S. 676 (1990).  *Wheeler* and *Duro* are grounded in tribal prosecutions for on-reservation conduct, but nonetheless recognize that tribes possess "attributes of sovereignty over both their *members* and their *territory*." *See Wheeler*, 435 U.S. at 323 (emphasis added).  In discussing the historical context of tribal prosecutions, *Wheeler* explains that "before the coming of the Europeans, the tribes were self-governing sovereign political communities.  Like all sovereign bodies, they then had the inherent power to prescribe laws for their members and to punish infractions of those laws." *Id*.  The Band points to the logical conclusion that Indian tribes certainly enjoyed this inherent power beyond "reservation boundaries," which, as a general concept, did not exist prior to European settlement.  While *Wheeler* provides a legal basis for the uncontroversial belief that tribes did not historically tip-toe

around territorial borders in asserting their authority to enforce tribal laws, *Duro* offers the most direct support for membership-based jurisdiction. *See* 495 U.S. at 694. Affirming the inherent authority of tribes to try and prosecute their members, the Court in *Duro* recognized that the tribes' "criminal jurisdiction over members is accepted by our precedents and justified by the voluntary character of tribal membership and the concomitant right of participation in a tribal government, the authority of which rests on consent." *Id.* This consensual agreement between a tribe and its members provides the core principle underpinning and justifying a membership-based jurisdiction that is not rigidly tied to geographic qualifications. Though the Band's view of jurisdiction may not be squarely addressed by the holdings of *Wheeler* and *Duro*, it is at least supported by their reasoning. *See Duro*, 495 U.S. at 693 ("[I]n the criminal sphere membership marks the bounds of tribal authority[.]").

Kelsey reads the Supreme Court authorities differently, arguing that tribal sovereign authority "centers on the land held by the tribe and on tribal members within the reservation." *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 327 (2008);[3] Kelsey Br. at 31–35. Leaning on the district court's opinion, Kelsey argues that *Wheeler* and *Duro* are decisions firmly rooted in territory and do not "stand for the proposition that tribal membership is the sole basis for determining jurisdiction, but rather for the proposition that a tribe's authority to prosecute crimes within its territory is limited to its members." R. 41, Dist. Ct. Opinion at 3, Page ID 582. And Kelsey does marshal support lending credibility to the view that territory is a dominant factor in determining the scope of tribal authority. *See Plains Commerce Bank*, 554 U.S. at 327 (holding that a tribe did not have the authority to regulate the sale of non-Indian fee land located within the reservation); *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 647 (2001) (holding that a tribe did not have the authority to "tax nonmember activity occurring on non-Indian fee land"); *South Dakota v. Bourland*, 508 U.S. 679, 681–82 (1993) (considering whether "the Cheyenne River Sioux Tribe may regulate hunting and fishing by non-Indians on lands and overlying waters located within the Tribe's reservation but acquired by the United States" and holding that the tribe's right had been congressionally abrogated).

---

[3]The Band correctly points out that *Plains Commerce Bank* has nothing to do with membership-based jurisdiction but is instead concerned with tribal authority over non-Indians. Band Br. at 28.

But these cases miss the mark. Each one discusses tribal authority or jurisdiction only with respect to *non-members* instead of tribal *members*—a crucial distinction given the importance of tribal membership in determining various aspects of tribal sovereignty.[4] And Kelsey offers no persuasive reason why these cases—which do consider territory as a significant factor in determining the contours of tribal sovereignty—do not instead stand for the contrary proposition that tribal power is *at its zenith* where territory and membership intersect. Finally, neither Kelsey nor the district court can simply wish away the language in *Wheeler* and *Duro* that establishes membership as the historical determinant of who falls within the ambit of tribal criminal jurisdiction. That tribes maintain their inherent authority to try and punish their members for off-reservation conduct is neither surprising nor hard to accept given the "voluntary character of tribal membership and the concomitant right of participation in a tribal government, the authority of which rests on consent." *Duro*, 495 U.S. at 694.

Aside from *Wheeler* and *Duro*, a 1939 Opinion of the Solicitor of the Interior Department affirms that, "as a matter of historical record," the government believed tribes to have the authority to try and prosecute members for off-reservation conduct. *See* Solicitor's Opinion, April 27, 1939, 1 Op. Sol. on Indian Affairs 891, 896 (U.S.D.I. 1979). Underscoring this authority while discussing a separate jurisdictional question, the Opinion notes:

> That the original sovereignty of an Indian tribe extended to the punishment of a member by the proper tribal officers for the depredations or other forms of misconduct *committed outside the territory of the tribe cannot be challenged.* Certainly we cannot read into the laws and customs of the Indian tribes a principle of territoriality of jurisdiction with which they were totally unfamiliar, and which no country has adopted as an absolute rule. That Indian tribes friendly to the United States acted to punish their members for *depredations committed against whites outside of the Indian Country* is a matter of historical record.

Solicitor's Opinion at 9–10 (emphasis added).[5]

---

[4]*Compare, e.g., Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 206 (1978) (holding that tribal courts do not have the power to try non-Indians) *with Duro*, 495 U.S. at 686 (holding that the "power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status").

[5]The Solicitor's Opinion was published in *Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917–1974* ("Opinion Compilation"), a compilation of the Solicitor's official opinions that Congress directed be published in 1968. The purpose of publishing the Opinion Compilation was to advance an

Decisions from outside our Circuit also provide support for membership as a basis for the assertion of tribal sovereignty independent of tribal territory. *See Native Vill. of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 558 n.12 (9th Cir. 1991) ("[T]ribal sovereignty is not coterminous with Indian country . . . [r]ather, tribal sovereignty is manifested primarily over the tribe's members."); *see also Sidney v. Zah*, 718 F.2d 1453, 1456 (9th Cir. 1983) (noting that "[m]embership is therefore another aspect of tribal sovereignty *which exists separate and apart from the territorial jurisdiction* of the tribe" in holding that the Navajo Tribe must carry out a congressionally authorized federal court order even though the Navajo claimed that "tribal sovereignty stops at the border") (emphasis added); *Settler v. Lameer*, 507 F.2d 231, 237 (9th Cir. 1974) (holding that, though tribes did not have off-reservation arrest authority, they did have inherent sovereign authority to prosecute off-reservation fishing offenses because they had not ceded such authority by treaty, and because divestiture of such authority was not implied).

*Fife v. Moore*, 808 F. Supp. 2d 1310 (E.D. Okla. 2011), is the only modern case to consider membership-based criminal jurisdiction, and *Fife* explicitly rejects the Band's interpretation of *Wheeler* as a justification for extending jurisdiction to off-reservation conduct. In *Fife*, the petitioners were charged with theft-related crimes in tribal court and sought a temporary restraining order and preliminary injunction against tribal court proceedings in the United States District Court. *Id.* at 1311. Challenging tribal court jurisdiction, the petitioners argued that the tribal court did not have authority to try their offenses because they occurred outside of Indian country. *Id.* at 1314. The district court granted the preliminary injunction, explicitly rejecting "the inherent power [of tribes] to prescribe laws for their members," *Wheeler*, 435 U.S. at 323, as extending to off-reservation conduct, and holding that that the tribe lacked criminal jurisdiction over offenses outside of Indian country. *Fife*, 808 F. Supp. 2d at 1314. The district court noted that the defendant prosecuted in *Wheeler* had been arrested within the Navajo Indian reservation, and "[t]he conduct which formed the basis for the prosecution [in *Wheeler*] had also occurred on the reservation, according to the federal indictment." *Id.* at 1314. Thus,

---

"extremely valuable, but largely inaccessible, source for the study of Indian Law . . . [to] determine the status of Indian land and rights in natural resources, *define tribal governmental powers* and analyze many other subjects of vital import to Indian tribes and Indian people." Band Reply Br. at 10, Appendix A, Opinion Compilation "Introduction" (citing *United States v. Jackson*, 280 U.S. 183, 193 (1930), and *Udall v. Tallman*, 380 U.S. 1 (1965), for the proposition that "[t]he utility of these volumes is not that they have binding effect but that they are often accorded great weight by the courts").

*Fife* found *Wheeler*'s deference to tribal sovereignty in trying and punishing members as instructive only as to on-reservation conduct.

After additional briefing, the *Fife* court affirmed the tribal court's lack of extra-territorial jurisdiction, but significantly undercut its earlier analysis by hedging on the issue of membership-based criminal jurisdiction. It noted that the tribal respondents "may well be correct in their position [that the tribe had extra-territorial jurisdiction]," but due to the "few scattered references (quite few and quite scattered)" interpreting the issue of extra-territorial tribal jurisdiction, "the court is persuaded it should stand on its previous ruling." R. 32-2, *Fife* Slip Order at 2–3, Page ID 492–93. While *Fife* supports Kelsey's position, its reasoning is not persuasive. The analysis in the case wholly fails to consider the prominent language in *Duro* that advances membership-based jurisdiction and justifies criminal jurisdiction over members because of the consensual nature of tribal membership and the concomitant benefits resulting from tribal membership. *See Duro*, 495 U.S. at 694. *Fife* also places too great an emphasis on *Wheeler*'s on-reservation context. As previously discussed, none of the analysis in *Wheeler* and *Duro* hinges on the situs of the criminal conduct, but instead rests on the pronouncement that "[i]t is undisputed that Indian tribes have power to enforce their criminal laws against tribe members." *Wheeler*, 435 U.S. at 322. Finally, *Fife* significantly undermines its persuasive value by noting in its order that the tribe "may well be correct" in its view of membership-based jurisdiction. *Id.* at 493.[6]

**ii**

*Membership-Based Criminal Jurisdiction.* In sum, Indian tribes possess the inherent sovereign authority to try and punish members on the basis of tribal membership. *Wheeler* and *Duro* may not answer the specific question of whether tribes are permitted to exercise extra-territorial criminal jurisdiction over members, but their core principles strongly support the Band's theory of jurisdiction. Even reading *Wheeler* and *Duro* in their on-reservation context

---

[6]Kelsey's reliance on "Hornbook" law to suggest that tribal criminal jurisdiction ends at territorial borders is similarly unavailing. Kelsey Br. at 46. Felix S. Cohen's 1942 Handbook does cite to a footnote addressing an Attorney General opinion from 1886 that states "[t]he jurisdiction of the Indian tribe ceases at the border of the reservation." Felix S. Cohen, HANDBOOK OF FEDERAL INDIAN LAW 148 n.236 (1942). However, the 2012 version of Cohen's Handbook points to the opposite conclusion. *See* Felix S. Cohen, HANDBOOK OF FEDERAL INDIAN LAW, § 4.01(2)(d) (2012).

and recognizing that their language related to membership-based jurisdiction is arguably non-essential to their respective holdings, the reasoning behind tribal criminal jurisdiction in *Duro*—that a tribe's authority to prosecute its members is "justified by the *voluntary character of tribal membership* and the concomitant right of participation in a tribal government"—provides ample basis to validate the exercise of tribal criminal jurisdiction on the basis of membership. *See Duro* 495 U.S. 677–78 (emphasis added).

**B**

We next turn to whether tribes' inherent authority to exercise criminal jurisdiction over off-reservation conduct has been expressly limited by Congress or treaty. *See Wheeler*, 435 U.S. at 323. Kelsey has not identified any treaty or statute that explicitly divests the Band of extra-territorial criminal jurisdiction. Kelsey Br. at 36–37. Nor has the district court, which instead adopted the magistrate judge's conclusion that Indian tribes implicitly lost power to assert extra-territorial criminal jurisdiction over members as a "necessary result" of their dependent status. R. 35, R&R at 29, Page ID 530. Because no statute or treaty expressly divests the Band of its inherent authority to try and punish its members for off-reservation conduct, we turn to the issue of implicit divestiture.

**C**

We have concluded that, as a historical matter, Indian tribes have the inherent sovereign authority to try and prosecute members on the basis of tribal membership even if criminal conduct occurs beyond a tribe's Indian country. Our remaining inquiry, then, is whether the tribes have been implicitly divested of their authority to prosecute members for extra-territorial conduct by virtue of their domestic dependent status. We look first to the history and breadth of implicit divestiture, considering whether the Band's purported jurisdiction is consistent with the historical underpinnings of the doctrine. We then consider whether statutes extending federal jurisdiction into Indian country serve as a basis for implicitly divesting tribes of their jurisdiction over off-reservation offenses.

**i**

*Tribal Sovereignty and Implicit Divestiture*.  The principle of implicit divestiture was first articulated in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), a case examining tribal criminal jurisdiction over non-Indians.  *Oliphant* thoroughly canvassed the history of treaties, statutes, and judicial decisions regarding crimes in Indian country and found a "commonly shared presumption of Congress, the Executive Branch, and lower federal courts that tribal courts do not have the power to try *non*-Indians." *Id.* at 206 (emphasis added).  While Congress never "expressly forbade Indian tribes [from] impos[ing] criminal penalties on non-Indians," the Court made the "implicit conclusion . . . that Congress consistently believed this to be the necessary result of its repeated legislative actions." *Id*. at 204.  The Court based this "implicit conclusion" on the tribes' dependent status, identifying what it perceived to be an incongruous result should "Indian Tribes, although fully subordinated to the sovereignty of the United States, retain the power to try non-Indians according to [tribal] customs and procedure." *Id*. at 208–11.  Though additional decisions have further restricted tribal criminal jurisdiction over *non-members*, the Supreme Court has consistently affirmed that the "power of a tribe to prosecute its members for tribal offenses clearly does not fall within that part of sovereignty which the Indians implicitly lost by virtue of their dependent status." *Duro*, 495 U.S. at 686 (quoting *Wheeler*, 435 U.S. at 326) (internal quotation marks omitted);[7] *see also United States v. Lara*, 541 U.S. 193, 197, 205 (2004) (characterizing tribal criminal jurisdiction over members as an "inherent power[] of a limited sovereignty which has never been extinguished" and noting that, by contrast, the Court had treated "the power to prosecute nonmembers [as] an aspect of the tribes' external relations and hence part of the tribal sovereignty that was divested") (quoting *Wheeler*, 435 U.S. at 322)).

But, while tribes have not been implicitly divested of their right to prosecute members, their unique dependent status requires a more nuanced analysis in determining whether they may extend tribal prosecutions to members' off-reservation conduct.  In *Montana v. United States*,

---

[7]In response to *Duro*, Congress passed the "Duro Fix," affirming the inherent authority of tribes to exercise criminal jurisdiction over non-member Indians.  25 U.S.C. § 1301(2); *see Lara*, 541 U.S. at 200 ("Congress does possess the constitutional power to lift the restrictions on the tribes' criminal jurisdiction over nonmember Indians.").

450 U.S. 544 (1981), the Court clarified the extent of sovereign authority implicitly divested as a result of the tribes' dependent status. *Montana* first explained that "[t]hrough their original incorporation into the United States . . . the Indian tribes have lost many of the attributes of sovereignty[.]" *Id.* at 564. Defining the scope of retained inherent sovereignty, *Montana* held that the "exercise of tribal power *beyond what is necessary to protect tribal self-government or to control internal relations* is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.* at 564 (emphasis added).[8]

In determining whether extending criminal jurisdiction to off-reservation conduct is consistent with *Montana*'s view of retained tribal sovereignty, it is important to determine exactly what the Band is and is not arguing with respect to the scope of their jurisdictional power. Here we have no express congressional delegation granting the Band extra-territorial criminal jurisdiction. The Band is cognizant that a free-floating, membership-based jurisdiction over *any criminal conduct* could run headlong into *Montana*'s holding that retained tribal power (i.e. criminal jurisdiction) is only that which is "necessary to protect tribal self-government or control internal relations." *Id.* at 564. Therefore, the Band advocates for a more limited scope of extra-territorial criminal jurisdiction, arguing that its inherent authority to prosecute members for off-reservation conduct extends at least where the offenses "*substantially affect*[] *its self-governance interests*." Band Br. at 3, 41–42.[9]

---

[8] The terms "internal" and "external" are not used in a territorial sense. *See Wheeler*, 435 U.S. at 322 (discussing the tribe's "right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions" when referring to the *internal affairs* of a tribe, not to conduct within tribal boundaries). The Government Amicus offers another example of how conduct outside the reservation boundaries may plainly affect the tribes' "internal" affairs. "For example, when a tribe authorizes absentee voting in tribal elections by members residing outside the tribe's reservation, the voting is internal to the tribe, notwithstanding its off-reservation location. Likewise, a tribal prosecution of a member for off-reservation election fraud would be, in the words of the Supreme Court, the enforcement of an internal criminal law[.]" Government Amicus Br. at 17.

[9] Kelsey would have us read the Band's view of membership-based jurisdiction as extending to criminal conduct "based only on the fact of tribal membership." Kelsey Br. at 2, 13, 30. Through this overbroad characterization, Kelsey portrays a "sweeping" membership-based jurisdiction that would permit the Band to prosecute members "half a mile outside of its reservation borders or halfway around the world." Kelsey Br. at 13. However, this clearly ignores the Band's framing of the issue—that criminal conduct must "substantially affect[] [tribal] self-governance," Band Br. at 3, 41–42—and the limitations described in *Montana*'s characterization of retained tribal sovereignty post-incorporation. *See Montana*, 450 U.S. at 566–67.

We agree with the Band that Kelsey's conduct clearly implicates core governmental concerns and substantially affects the tribe's ability to control its self-governance.  Not only was Kelsey a member of the Band's nine-person legislative Tribal Council, but his victim was a tribal employee discharging her official duties at an official tribal elders' meeting.  The criminal conduct took place at the Community Center, "the center of Tribal community activities ever since it was purchased," serving to formerly house elements of the tribal judiciary and "provid[ing] tribal office space for the conduct of the business of a tribal sovereign."  R. 9, Tribal App'x at 13, PID 1539.  This is no run-of-the-mill criminal conduct, but conduct visited on the Band's employee by the Band's *own elected official* during an official tribal function:  in pure form, this was an offense against the peace and dignity of the Band itself.  While certain applications of extra-territorial criminal jurisdiction might well be incompatible with the tribes' status as dependent sovereigns—that is, where they tangentially impact tribal self-governance or fail to implicate core internal relations, *see Montana*, 450 U.S. at 564—the instant exercise of criminal jurisdiction does not fall within that category.

**ii**

*Should Implicit Divestiture Be Inferred From Federal Statutes*?  Kelsey suggests that several statutes extending federal criminal jurisdiction into Indian country—the Indian Trade and Intercourse Act ("Non-Intercourse Act"), 1 Stat. 137 (1790), the Indian Country Crimes Act ("ICCA"), 18 U.S.C. § 1152 (1948), and the Major Crimes Act ("MCA"), 18 U.S.C. § 1153 (1948) (collectively the "Indian country statutes")—demonstrate a congressional belief that tribes have been implicitly divested of criminal jurisdiction *outside* their territory.  The Non-Intercourse Act established federal jurisdiction to enforce state criminal laws against non-Indians who committed offenses against Indians in Indian country. *Oliphant*, 435 U.S. at 201.  The ICCA made the general laws of the United States applicable to Indian country where either the victim or the defendant is an Indian, but not where both victim and defendant are Indians.  18 U.S.C. § 1152.  The MCA extended federal criminal jurisdiction over Indians for specifically delineated offenses committed within the reservation.  18 U.S.C. § 1153 ("Any Indian who commits . . . murder, manslaughter, kidnapping, [etc.] . . . shall be subject to the same law and penalties as all other persons . . . within the exclusive jurisdiction of the United States.").  However, none of

these statutes addresses a tribe's authority over member conduct outside the reservation. According to the district court:

> While the statutes do not directly address the issue of a tribe's jurisdiction outside Indian country, they are instructive in determining how Congress views the issue of tribal jurisdiction. The statutes establish a comprehensive legislative framework for concurrent criminal jurisdiction in Indian country. However, the Court is not aware of a single statute discussing concurrent jurisdiction outside Indian country. That legislative void lends to the conclusion that Congress believes that tribes do not have jurisdiction outside their territory.

R. 41, Opinion at 4–5, Page ID 584–85.

However, it is not clear that this "legislative void" evidences Congressional intent to limit tribal criminal jurisdiction to Indian country. First, *Wheeler* considers the Non-Intercourse Act and the ICCA to be examples of general limitations on tribal criminal jurisdiction that do not limit tribal authority over members. 435 U.S. at 325 (discussing the statutes above and noting that "far from depriving Indian tribes of their sovereign power to punish offenses against tribal law by members of a tribe, Congress has repeatedly recognized that power and declined to disturb it"). Second, viewing the "legislative void" as instructive of congressional intent is in tension with governing authority holding that "the proper inference from [congressional] silence . . . is that the sovereign power . . . remains intact." *LaPlante*, 480 U.S. at 18 (ellipses in original); *see also Helvering v. Hallock*, 309 U.S. 106, 121 (1940) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle."). Third, the fact that Congress did "not directly address the issue of a tribe's jurisdiction outside Indian country," R. 41, Opinion at 4, Page ID 583, should not be read to limit tribal sovereignty. In fact, given *Bay Mills'* pronouncement that "courts will not lightly assume that Congress in fact intends to undermine Indian self-government," 134 S. Ct. at 2032, congressional silence in matters of tribal sovereignty is more aptly viewed as congressional deference to tribal sovereignty.

The district court adopted the magistrate judge's view that it would be "inconceivable" that Congress chose to "regulate[] tribal jurisdiction [in] Indian country closely for these past two centuries, while leaving the tribes free to assert criminal jurisdiction outside Indian country." R. 41, Opinion at 4–5, Page ID 583–84; R. 35, R&R at 28, Page ID 529. But Congress

established federal or state criminal jurisdiction within Indian reservations to provide criminal justice where tribal powers were presumed absent or inadequate. In passing the Indian country statutes, Congress chose not to speak regarding member offenses committed outside the reservation because, as the Supreme Court stated in *Bay Mills*, "the problem Congress set out to address . . . arose in Indian lands alone." 134 S. Ct. at 2034 (noting that Congress responded to a Supreme Court decision which held that the states lacked any regulatory authority over gaming on Indian lands by passing the Indian Gaming Regulatory Act, which specifically permitted the regulation of gaming on Indian lands).

These authorities and statutes speak only to tribal criminal jurisdiction over non-Indians and fail to truly address extra-territorial jurisdiction. Given the baseline assumption that, "until Congress acts, the tribes retain their historic sovereign authority," we "respect [] Congress's primary role in defining the contours of tribal sovereignty" and refuse to "lightly assume that Congress in fact intends to undermine Indian self-government." *Bay Mills*, 134 S. Ct. at 2026, 2032, 2039.

## IV

Because prosecuting Kelsey's conduct was "necessary to protect tribal self-government or control internal relations," *Montana*, 450 U.S. at 564, the Band retained authority to assert criminal jurisdiction over his off-reservation conduct. Accordingly, we reverse the district court's grant of habeas relief for lack of tribal jurisdiction. Because the Band properly exercised jurisdiction to prosecute Kelsey, we must consider whether Kelsey is entitled to relief for his due process challenge under the Indian Civil Rights Act.

## V

The Bill of Rights and the Fourteenth Amendment do not of their own force apply to Indian tribes. *See Talton v. Mayes* 163 U.S. 376, 384 (1896); *United States v. Doherty*, 126 F.3d 769, 777 (6th Cir. 1997). Thus, the Indian Civil Rights Act ("ICRA"), 25 U.S.C. § 1302(a)(8), is

the only basis for Kelsey's asserted due process violation.[10]  The ICRA requires tribes to accord all persons within their jurisdiction enumerated rights akin to the federal Bill of Rights.  At the time of Kelsey's conviction, the ICRA provided:

> No Indian tribe in exercising powers of self-government shall * * * *deny to any person within its jurisdiction* the equal protection of its laws or deprive any person of liberty or property without due process of law . . . .

25 U.S.C. § 1302(a)(8) (amended in 2010).    Because Kelsey's off-reservation conduct significantly affected the Band's self-governance and internal relations, thus falling within tribal jurisdiction, the ICRA extends due process protections to Kelsey in the Tribal prosecution. Kelsey contends that the Tribal Court of Appeals' decision to strike down a territorial limitation on the Band's jurisdiction in one of the Tribal criminal ordinances and "retroactively expand[] the geographic reach" of criminal jurisdiction over his off-reservation conduct is "unexpected and indefensible," violating the due process protection of fair notice established in *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964).

Ordinarily, we defer to tribal court interpretations of tribal law "because tribal courts are best qualified to interpret and apply tribal law." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987).  However, as the Band's criminal procedures do not "differ significantly from those 'commonly employed in Anglo-Saxon society' . . . federal constitutional standards are employed in determining whether the challenged procedure violates the Act." *Randall v. Yakima Nation Tribal Court*, 841 F.2d 897, 900 (9th Cir. 1988).

## A

*The Tribal Court of Appeals' Jurisdiction Order.*    During his appeal in Tribal court, Kelsey asserted that the Band's internal laws precluded jurisdiction based on the Band's Criminal Offenses Ordinance.  Section 4.03(a) of the Offenses Ordinance extended criminal jurisdiction to "[1] all land within the limits of the Tribe's reservation . . . [2] [land] held in trust by the United States . . . and [3] land considered 'Indian country.'"  R. 1-11, Offenses Ordinance

---

[10]For ICRA due process protections to apply, the tribal prosecution must be "within [tribal] jurisdiction." 25 U.S.C. § 1302(a)(8).  Having answered the threshold question in the affirmative, we now assess the merits of Kelsey's due process claim.

at 4, Page ID 91.[11] Section 4.03(b) looked beyond these three categories, enumerating nine offenses for which the Band's criminal jurisdiction would extend to "wherever committed." *Id.* Sexual assault was not one of the enumerated offenses. Kelsey argued that the tribal courts therefore lacked criminal jurisdiction over his conduct because it fell outside of the territorial provisions in Section 4.03(a) of the Offenses Ordinance.

The Tribal Court of Appeals accepted that the Offenses Ordinance did facially limit Tribal jurisdiction but interpreted the ordinance in conjunction with a separate criminal ordinance and the Tribal Constitution's definition of jurisdiction. Article I of the Tribal Constitution provided:

> Section 1 – *Territory*. The territory of the Little River Band of Ottawa Indians shall encompass all lands which are now or hereinafter owned by or reserved for the Tribe[.]
>
> Section 2 – *Jurisdiction Distinguished from Territory*. The Tribe's jurisdiction over its members and territory shall be exercised *to the fullest extent consistent with this Constitution, the sovereign powers of the Tribe, and federal law*.

R. 1-9, Constitution at 2, PID 48 (emphasis added). Together, Sections 1 and 2 required extending jurisdiction over tribal members and also to tribally-owned land (like the Community Center) "to the fullest extent" permissible under tribal and federal law. In the Jurisdiction Order, the Tribal Court of Appeals recognized that this expansive definition of jurisdiction mandated by the Constitution made "tribal jurisdiction [] **larger** than territory because some tribal authority extends beyond its land, e.g. tribal membership[.]" R. 9, Jurisdiction Order at 5, PID 1541 (emphasis in original). After determining that the Tribal Constitution affirmatively required expansive jurisdiction, the Tribal Court of Appeals then examined the separate Criminal Procedure Ordinance that also gave the Band's constitutionally-mandated criminal jurisdiction operative force. Like Section 4.03 of the Offenses Ordinance, Section 8.08 of the Procedure Ordinance referred to the scope of tribal criminal jurisdiction. However, the Procedure Ordinance explicitly incorporated the constitutional definition of jurisdiction, stating:

---

[11]The Band concedes for purposes of this litigation that the Community Center does not fall within any of these categories. In the Jurisdiction Order, the Tribal Court of Appeals also assumed that the Community Center did not fall within the ambit of Section 4.03(a).

8.08. *Jurisdiction*. The Tribal Court shall have jurisdiction over any action by any Indian as defined by this Ordinance, that is made a criminal offense under applicable Tribal Code and *that occurred within the territorial jurisdiction of the Tribe as defined in the Constitution*.

R. 12, Tribal Law App'x at 32, PID 785.

Reading Section 4.03 of the Offenses Ordinance to conflict with Section 8.08 of the Procedure Ordinance and the Tribal Constitution's definition of jurisdiction, the Tribal Court of Appeals found the Offenses Ordinance's limited criminal jurisdiction to be "unconstitutionally narrow in that it does not provide for the exercise of inherent criminal jurisdiction over all tribal lands." R. 9, Jurisdictional Order at 6, PID 1542. To harmonize the Offenses Ordinance with the Tribal Constitution, the Tribal Court of Appeals removed its dissonant territorial limitation, making it consistent the Procedures Ordinance and affirming Tribal jurisdiction over Kelsey's off-reservation conduct on land owned by the tribe. On appeal, Kelsey contends that the Tribal Court of Appeals violated his due process guarantee of fair notice because it "created criminal jurisdiction where—by the Band's own legislation—none existed before," increased his punishment from a "baseline of zero" by adding a new sovereign prosecutor into the mix, and "denied him a complete defense to his charges."[12] Kelsey Br. at 17.

**B**

*Kelsey's Due Process Claim.* Due process protects against judicial infringement on the "foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent *conduct*." *Rogers v. Tennessee*, 532 U.S. 451, 459 (2001) (emphasis added). *See also Bouie*, 378 U.S. at 351 (describing fair notice as the principle that "no man shall be held criminally responsible for *conduct* which he could not reasonably understand to be proscribed") (emphasis added). Our cases reiterate this emphasis on the retroactive criminalization of *conduct* in examining fair notice challenges, noting that the "touchstone behind [fair notice] concerns is an examination of the statute to determine whether, either on its face or as construed, the provision in question

---

[12]The exercise of Tribal criminal jurisdiction "increased the potential quantum of punishment for his actions" because now the State of Michigan and the Band could punish Kelsey for the same action. *See Lara*, 541 U.S. at, 210; National Association of Criminal Defense Lawyers Amicus Br. at 20.

made it reasonably clear at the relevant time that the defendant's *conduct* was criminal." *United States v. Blaszak*, 349 F.3d 881, 886 (6th Cir. 2003) (emphasis added). Thus, as *Bouie* and its progeny make clear, fair notice cases "involve[] judicial decisions that allegedly retroactively converted an innocent act into a crime." *Webb v. Mitchell*, 586 F.3d 383, 393 (6th Cir. 2009).

Kelsey cannot seriously argue that his conduct—touching the victim's breasts through her clothing—was "innocent" conduct that was retroactively criminalized by the Jurisdiction Order. The Offenses Ordinance had clearly proscribed inappropriate sexual contact when Kelsey accosted Foster at the Community Center. His conduct was criminal, regardless of where it occurred, and he could only avoid punishment if both the Tribal Court of Appeals considered itself bound by the territorial provision in the Offenses Ordinance and the State of Michigan chose to forgo prosecution.[13] Though the Band and not the State of Michigan prosecuted Kelsey, he was "subject to prosecution somewhere." *See United States v. al Kassar*, 660 F.3d 108, 119 (2d Cir. 2011) ("Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States *so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere*.") (emphasis added).

Under existing case law, fair notice protection has not been extended to an expansion of jurisdiction as opposed to a retroactive criminalization of *conduct*. However, we need not rely on this distinction here because even if retroactive jurisdictional changes *did* implicate fair notice concerns in a case like Kelsey's, the Court of Appeals' decision to recognize jurisdiction over Kelsey's conduct was not "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue[.]" *Bouie*, 378 U.S. at 354.

**i**

*Bouie* and *Rogers* define the circumstances under which judicial construction of a statute may be deemed to violate the due process fair notice requirement:

> In *Bouie v. City of Columbia*, we considered the South Carolina Supreme Court's retroactive application of its construction of the State's criminal trespass statute to

---

[13]Kelsey's conduct would likely be classified in Michigan as criminal sexual conduct in the fourth degree. *See* Mich. Comp. Laws Ann. § 750.520e.

the petitioners in that case. The statute prohibited "entry upon the lands of another . . . after notice from the owner or tenant prohibiting such entry . . . ." The South Carolina court construed the statute to extend to patrons of a drug store who had received no notice prohibiting their entry into the store, but had refused to leave the store when asked. Prior to the court's decision, South Carolina cases construing the statute had uniformly held that conviction under the statute required proof of notice before entry. None of those cases, moreover, had given the "slightest indication that that requirement could be satisfied by proof of the different act of remaining on the land after being told to leave."

*Rogers*, 532 U.S. at 456–57 (internal citations omitted). In holding that the South Carolina court's retroactive application of its construction violated due process, the Supreme Court explained that "[i]f a judicial construction of a criminal statute is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue,' [the construction] must not be given retroactive effect." *Id.* at 457 (quoting *Bouie*, 378 U.S. at 354) (alterations in original). Because the state court's construction of the statute was "so clearly at variance with the statutory language, [and] ha[d] not the slightest support in prior South Carolina decisions," the Supreme Court found that the state court's retroactive application of the new interpretation could not stand. *Bouie*, 378 U.S. at 356.

In *Rogers*, the Supreme Court held that the Tennessee Supreme Court's decision to eliminate the "year and a day rule" from the common law was not a violation of the fair notice principles set forth in *Bouie*.[14] *Rogers*, 532 U.S. at 462. Recognizing the "divergent pulls of flexibility and precedent in our case law system," the Court rejected rigid *ex post facto* limitations on judicial decision-making to avoid placing "an unworkable and unacceptable restraint on normal judicial processes [that] would be incompatible with the resolution of uncertainty that marks any evolving legal system." *Id.* at 461. While still applying the "unexpected and indefensible" standard, the Court characterized the year and a day rule as a relic of the common law which itself "presuppose[d] a measure of evolution." *Id.* Accordingly, it found this circumstance to be one where there "arises a need to clarify or even to reevaluate prior opinions as new circumstances and fact patterns present themselves." *Id.* Because the state court's decision to eliminate the rule was "[f]ar from a marked and unpredictable departure from

---

[14]The Tennessee common law "year and a day rule" precluded defendants from being convicted of murder unless the victim died by the defendant's act within a year and a day of the act. *Rogers*, 532 U.S. at 451.

prior precedent," and its elimination was foreseeable as it "had only the most tenuous foothold as part of the criminal law of the State of Tennessee," the Supreme Court found the retroactive abolition of the year and a day rule to face no constitutional impediment. *Id.* at 464, 466–67.

**ii**

The Tribal Court of Appeals' decision is a far cry from *Bouie*. It more closely resembles a "routine exercise of common law decisionmaking," *Rogers*, 532 U.S. at 467, than an "unexpected and indefensible" judicial construction that runs headlong into the constitutional protections of due process. *See Bouie*, 378 U.S. at 354. In fact, the decision to extend criminal jurisdiction to Kelsey's conduct was foreseeable, given that we do not make an "ad hoc appraisal of the subjective expectations" of the defendant, but instead base our decision on the "statute itself *and the other pertinent law*" in determining whether a defendant has not received fair notice. *Id.* at 355 n.5 (emphasis added). As directly addressed in the Jurisdiction Order, the Tribal Constitution *mandated* the exercise of jurisdiction over Kelsey's conduct because his crime occurred on land owned by the Band. The Procedure Ordinance, one of the ordinances giving operative effect to the Band's constitutionally-mandated jurisdiction, explicitly defined criminal jurisdiction by reference to the Constitutional definition. Only the Offenses Ordinance limited jurisdiction to on-reservation conduct. That the Tribal Court of Appeals chose to subordinate the Offenses Ordinance's territorially-limited jurisdiction to the Tribal Constitution's explicit definition, thereby reconciling the scope of criminal jurisdiction in two criminal ordinances, is not only unsurprising but is within the Tribal Court of Appeals' authority to "rule void those ordinances and resolutions deemed inconsistent with [the Band's] Constitution." R. 12, Tribal Law App'x at 12, Const. Art. VI, Sec. 8(a)(2), PID 765. While due process does restrict courts from upending settled constructions of law, it does not strip courts of the flexibility to clarify and resolve uncertainties in the law. *See O'Neal v. Bagley,* 743 F.3d 1010, 1017 (6th Cir. 2013) (holding that resolving uncertainty evident in state appellate court interpretations of conflicting statutory provisions "was not unexpected and indefensible by reference to [existing] law.") (internal quotations omitted).

These are not the only provisions that put Kelsey on notice that his conduct was within tribal jurisdiction. For instance, the Tribal Court Ordinance which "establish[es] the purposes,

powers, and duties of the Tribal Courts" noted in multiple sections that Tribal jurisdiction shall extend to all civil and criminal matters arising under the Tribal Constitution's definition of jurisdiction.  R. 12, Tribal Law App'x at 22, PID 775.

Yes, we must accept the legal fiction that Kelsey read and understood the jurisdictional limitation in the Offenses Ordinance before he committed his crime, but we need not and should not grant him the luxury of picking and choosing à la carte which ordinances he read.  While we do look to the "statute itself," "the other pertinent law," *Bouie*, 378 U.S. at 355 n.5, weighs significantly in favor of finding that Kelsey was not denied adequate notice:  the Tribal Constitution Art. I, Section 1 & 2; the Tribal Constitution Art. VI, Section 8; the Criminal Procedure Ordinance, and the Tribal Court Ordinance all provided warning that criminal jurisdiction would extend to Kelsey's conduct by virtue of either Tribal ownership of the Community Center or Kelsey's tribal membership.  Given the need to harmonize jurisdiction in the Offenses Ordinance with the Procedure Ordinance and the Tribal Constitution, and with notice provided by multiple constitutional provisions and tribal ordinances, we hold that the Tribal Court of Appeals' "new construction was not 'unexpected and indefensible by reference to [existing] law.'"  *See O'Neal*, 743 F.3d at 1017 (quoting *Bouie*, 378 U.S. at 354).

## VI

For the reasons above, we reverse the decision of the district court and vacate its grant of habeas relief.